# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

————————

LEON DRUMMOND, LEE WILLIAMS, and YESHONDA DRIGGINS, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees*,

v.

PROGRESSIVE SPECIALTY INSURANCE CO.,

PROGRESSIVE ADVANCED INSURANCE CO.,

*Defendants-Appellants*.

————————

On Appeal from the United States District Court for the Eastern District of Pennsylvania, No. 5:21-cv-04479,
The Honorable Edward G. Smith

————————

## ANSWER / REPLY BRIEF

## – FILED UNDER SEAL –

————————

Jacob L. Phillips
JACOBSON PHILLIPS PLLC
478 E. Altamonte Drive
Suite 108-570
Altamonte Springs, FL 32701
407-720-4057
jacob@jacobsonphillips.com

Hank Bates
Lee Lowther
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
(501) 312-8500
hbates@cbplaw.com
llowther@cbplaw.com

June 28, 2024

*Counsel for Plaintiffs-Appellees*

# DISCLOSURE STATEMENT

Pursuant to rule 26.1 and Third Circuit LAR 26.1, Plaintiffs-Appellees are not corporations.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................ i

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ...............................................................................2

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF THE ISSUES.........................................................3

STATEMENT OF THE CASE.............................................................4

A.  Factual Background.....................................................................4

    1.  Progressive's Form Policies and Uniform Procedures ...................4

    2.  Progressive's Total Loss Valuation Methodology.........................4

    3.  Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards ...................................................................6

    4.  To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory .......................8

B.  The Appealed Order ...................................................................11

SUMMARY OF ARGUMENT ...........................................................12

STANDARD OF REVIEW ...............................................................17

ARGUMENT ...................................................................................17

A.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT COMMON ISSUES PREDOMINATE ...........17

    1.  The district court did not abuse its discretion in finding that it is more likely than not that common evidence can be used to establish whether class members have Article III standing and that Progressive breached its contract....................................................................................18

    a.  Article III.................................................................................19

    b.  Liability ..................................................................................22

B. The district court did not abuse its discretion in finding that individualized vehicle valuations—which have already occurred and are not contested—do not predominate over common questions. ...................................................................25

C. The district court did not abuse its discretion in finding that Progressive's manipulation and exclusion of data contributes to finding that common issues are likely to predominate. ............................................................................35

D. Plaintiffs were not required to prove that their evidence of ACV is the only evidence of ACV.......................................................................................41

B. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THERE WERE COMMON QUESTIONS WITHIN THE MEANING OF RULE 23(A)(2).................................................................................................45

C. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING PLAINTIFFS ARE ADEQUATE AND THERE ARE NO DISQUALIFYING INTRACLASS CONFLICTS ...................................................................49

CONCLUSION ......................................................................................51

For the foregoing reasons, the Order on appeal should be affirmed. ......................51

CERTIFICATE OF SERVICE ............................... **Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

## Cases

*Ambrosio v. Progressive Preferred Ins. Co.*, 2024 U.S. Dist. LEXIS 36963 (D. Ariz. Mar. 4, 2024) ...............................................................................32

*Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015)..........18

*Bastian v. Marienville Glass Co.*, 281 Pa. 313 (1924) ...........................................20

*Brown v. Progressive Mountain Ins. Co.*, 2024 WL 399479 (N.D. Ga. Feb. 1, 2024) ........................................................................................... 24, 26

*Brown, et al. v. Progressive Mountain Ins. Co., et al.*, No. 3:21-cv-175-TCB, 2023 U.S. Dist. LEXIS 136472 (N.D. Ga. Aug. 3, 2023) ................................. 12, 38, 49

*Chadwick v. State Farm Mut. Auto. Ins. Co.*, No. 4:21-cv-1161-DPM, 2024 U.S. Dist. LEXIS 47154 (E.D. Ark. Mar. 18, 2024) ....................................... 12, 24, 33

*Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-cv-02482, 2023 U.S. Dist. LEXIS 153813 (W.D. Tenn. Aug. 25, 2023) ................................... 12, 27, 31, 45

*Cohen v. Resolution Tr.*, 107 F. App'x 287 (3d Cir. 2004) .....................................20

*Costello v. Mountain Laurel Assurance Co.*, No. 2:22-CV-35, 2024 U.S. Dist. LEXIS 11283 (E.D. Tenn. Jan. 22, 2024) ............................................................12

*Cottrell v. Alcon Labs.*, 874 F.3d 154 (3d Cir. 2017)..............................................19

*Curran v. Progressive Direct Ins. Co.*, 345 F.R.D. 498 (D. Colo. 2023)........ passim

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) .......... 48, 50

*Dickinson v. Fire Ass'n of Philadelphia*, 378 Pa. 396 (Pa. 1954) ..........................22

*Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 U.S. Dist. LEXIS 140205 (E.D. Pa. Aug. 11, 2023) ........................................................................12

*Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178 (3d. Cir. 2019) ..................................39

*Freeman v. Progressive Direct Ins. Co.*, No. 1:21-cv-03798-DCC, 2024 U.S. Dist. LEXIS 83402 (D.S.C. May 8, 2024) ............................................................. 12, 27

*Garza v. Citigroup Inc.*, 881 F.3d 277 (3d Cir. 2018)..............................................21

*Gates v. Towery*, 430 F.3d 429 (7th Cir. 2005) ......................................................19

*Greenwich Collieries v. Dir., Off. of Workers' Comp. Programs*, 990 F.2d 730 (3d Cir. 1993) ..........................................................................................................18

*Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452 (6th Cir. 2020) .............. 30, 31

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2009)........... 16, 44

*In re Modafinil Antitrust Litig.*, 837 F.3d 238 (3d. Cir. 2016) ................................38

*Kroeger v. Progressive Universal Ins. Co.*, No. 4:22-cv-00104-SHL-HCA, 2023 U.S. Dist. LEXIS 231824 (S.D. Iowa Nov. 20, 2023) .........................................32

*Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022)....... 25, 26, 27, 42

*Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452 (3d Cir. 2024) ..................................20

*Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700 (5th Cir. 2020) ........... 30, 31

*Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, No. C20 454 MJP, 2022 WL 1404526 (W.D. Wash. May 4, 2022) ....................................................................25

*O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757 (3d Cir. 2021) .................................17

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ............................... 11, 17, 33

*Reynolds v. Progressive Direct Ins. Co.*, 346 F.R.D. 120, 2024 U.S. Dist. LEXIS 63031 (N.D. Ala. Apr. 3, 2024) .............................................................. passim

*Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414 (5th Cir. 2023)... 27, 28, 41, 50

*Schleicher v. Wendt*, 618 F.3d 679 (7th Cir. 2010) ........................................ 38, 47

*Schroeder v. Progressive Paloverde Ins. Co.*, No. 1:22-cv-00946-JMS-MKK, 2024 U.S. Dist. LEXIS 14044 (S.D. Ind. Jan. 26, 2024) ....................................... 12, 49

*Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F. 4th 976 (8th Cir. 2021). 15, 22, 37, 46

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ...........................................20

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ....................................................43

*United States v. Glecier*, 923 F.2d 496 (7th Cir.), *cert. denied*, 502 U.S. 810 (1991) ...................................................................................................................17

*Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181 (11th Cir. 2003) ..........49

*Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ 6243, 2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023) .................................................................. passim

**Statutes**

31 Pa. Code § 62.3 .................................................................................................50

*Minnick v. Mississippi*, 498 U.S. 146 (1990).........................................................21

**INTRODUCTION**

This case concerns whether Progressive[1] breached its contractual obligations in determining the actual cash value (ACV) of totaled vehicles, which, per its insurance policy, must be "determined by" market value, age, and vehicle condition. The Parties agree all elements of Progressive's vehicle valuations are proper and legitimate, save for one: the "projected sold adjustment" (PSA), which reflects Progressive's untested and verifiably false assumption that used car dealerships uniformly price vehicles above market and negotiate down from there in cash transactions with no other variables or ancillary products at play.

Plaintiffs presented evidence that this is simply untrue. Indeed, to justify application of the projected sold adjustments, Progressive had to manipulate and truncate vast swaths of data—it simply deleted all data where vehicles sold for list price or more. Meanwhile, unmanipulated empirical data shows vehicles typically sell for list price: The mode, mean, and median vehicle sells for list price. Moreover, used car industry experts agree in the Internet age, used car dealers must (and do) price to market. And the only appraisal expert in this case testified that the projected sold adjustments conflicts with proper appraisal standards.

Thirteen courts have addressed materially indistinguishable claims based on materially indistinguishable records. Ten have held class treatment is appropriate.

_____

[1] This brief refers to Defendants-Appellants as "Progressive."

Two were set for classwide trials: *Volino* on July 8, 2024, in the Southern District of New York (before it settled classwide); and *Brown*, which will go to trial January 28, 2025, in the Northern District of Georgia. The question facing this Court is whether the Honorable Judge Edward G. Smith abused his discretion by joining with the majority of jurists to consider such claims to find that Progressive's liability to its Pennsylvania insureds should be tried classwide. Respectfully, the answer is clearly "no."

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellees agree this Court has jurisdiction.

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion by holding—consistent with nine other courts—that common questions are likely to predominate, where Plaintiffs introduced common evidence showing Progressive breached its contractual obligation to pay actual cash value as "determined by market value, age, and condition" by applying an invented "negotiation" deduction, the PSA, predicated on manipulated data and demonstrably false assumptions about the used auto market and in conflict with uncontroverted appraisal standards, and which resulted in an underpayment of ACV?

2.      Whether the district court abused its discretion by finding Plaintiffs are adequate class representatives and there is no disqualifying intraclass conflict where,

if Plaintiffs succeed, every single Class member will receive a monetary damages payment?

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. Progressive's Form Policies and Uniform Procedures

Throughout the Class Period, Progressive used form insurance policies with materially identical language. Appx955 (Tr. 26-29).[2] Progressive's Policy limits its liability for total loss auto claims to the ACV of the insured vehicle and specifies that ACV must be determined by the "market value, age, and condition" of the insured vehicle. Appx116–17. Plaintiffs and Class Members experienced damage to their vehicles which Progressive deemed a total loss. Appx131, 141, 155, 1019, 1022 (Tr. 27, 30). Consistent with its Policy terms, Progressive's uniform practice is to base total loss payments on Mitchell's appraisal of the vehicle's ACV. At issue is the only element of that appraisal that systematically results in the undervaluing of total loss vehicles.

#### 2. Progressive's Total Loss Valuation Methodology

Progressive uses a third-party vendor, Mitchell, to generate valuation reports to value total-loss vehicles. Appx168-169. After an adjuster inputs the vehicle information, the report is generated through Mitchell's WorkCenter Total Loss

---

[2] Citations to "Appx__" are to documents in the Joint Appendix.

("WCTL") system. Appx957-959 (Tr. 37–38, 40–42). Progressive used WCTL to create "Dual Source Reports" throughout the Class Period as its default method of calculating ACV for Pennsylvania insureds. Appx959-960, 963 (Tr. 44-46, 55–59).

These appraisals consist of Mitchell identifying the listed price of comparable vehicles. Appx1336. Then, it applies a PSA deduction to these list prices, purportedly to "reflect consumer purchasing behavior (negotiating a different price than the list price)." Appx959 (Tr. 42); *see also* Appx131 at 10. In other words, Progressive represents that car dealerships uniformly price vehicles above market and negotiate down to the actual market value—thus, according to Progressive, the advertised prices must be reduced by a PSA of (on average) ███. Appx1197. The new "price"—reduced by the PSA—of each comparable vehicle is then adjusted based on observed and documented differences, if any, between that comp vehicle and the insured vehicle in mileage or equipment. Appx1302 (Tr.142–43).

The average of the adjusted prices is the vehicle's "base" market value. *Id.* (Tr. 144–45). This base market value is then averaged with another source, such as the N.A.D.A. Guidebook, to arrive at the "Dual Source Base Value." Appx963(Tr. 58:7-20).[3] From there, Mitchell adjusts the base value amount based on the total-

---

[3] Progressive uses two sources of value in its Dual Source reports because, under Pennsylvania law, insurance companies appraising totaled vehicles using the "guide source method" must "calculate the average of two figures reflecting the retail book value of a vehicle of like kind and condition[.]" 31 Pa. Code § 62.3(e)(1)(i); *accord* Appx960 (Tr. 46). The statute further requires that the "appraised value *shall* be adjusted for equipment and mileage" and prohibits "other deductions . . . except for salvage[.]" 31 Pa. Code § 62.3(e)(1)(i) (emphasis added).

loss vehicle itself—if the total-loss vehicle was in below- or above-average condition, for example—which establishes what Progressive represents is the vehicle's adjusted market value. Appx1302 (Tr. 145). Lastly, any taxes, fees, and deductible are automatically applied, which becomes the claim payment amount. Appx957 (Tr. 74).

### 3. Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards

Progressive's assertion that list prices of comparable vehicles are bloated and consumers routinely negotiate advertised prices down is belied by market realities. Plaintiffs' industry expert explains Progressive's position is an outdated and false characterization of the market. Appx413–15 ("Felix Rep."); Appx555–56 ("Mlinko Rep."). Many years prior to the Class Period, it was perhaps a fair characterization of market forces: Without Internet advertising and sophisticated pricing tools, the "sticker" price was not really a factor—consumers went to the local dealership with the desired vehicle type and could not easily compare listed prices across numerous dealerships. Appx413–16 Now, not only can dealers identify the precise amount at which comparable vehicles are listed in the market, but so too can consumers—and if the dealership prices above market, consumers will know it and will patronize competing dealerships who price to market. *Id.*

This does not mean vehicles invariably sell for the precise listed price—there are numerous reasons unrelated to actual cash value why vehicles sell for less (or

more) than list price. A dealership might sell a vehicle for less than list price if, *inter alia*, (i) they are getting points on a loan; (ii) there is a special discount (military, employee, friends/family); (iii) a consumer is entitled to apply a "credit" earned through the service department; or (iv) the purchaser had an attractive trade-in that incentivized the dealership to sell at a below-market price so as to obtain the trade-in vehicle. Appx416–19. But these reasons are unrelated to the actual market price (or *value*) of a vehicle. *Id.*

Plaintiffs' appraisal expert explains the "comp" methodology Progressive utilizes is a line-item method to arrive at the ACV of damaged property, pursuant to which appraisers take the list prices of comparable vehicles and make line-item adjustments for documented differences in mileage, equipment, and condition. Appx712–16. Any adjustment must be based on observed, documented, and verifiable data. Appx714–16. Other than the PSA, Mitchell's method is consistent with this standard and documents a detailed, sound, and reliable appraisal of each loss vehicle that Progressive presents to the insured as ACV. Appx716–19. Progressive offers no appraiser of its own to counter this evidence.

But Progressive deviated from proper appraisal standards in applying the PSA. *Id.* Because the PSA is not based on observed, verified data, it is necessarily arbitrary and inconsistent with proper appraisal standards. Appx714–16. Merritt explains the proper method for identifying a vehicle's ACV is to take the average

price of comparable vehicles, adjusted for documented differences in mileage, condition, and equipment. Appx712–16. As such, the market value of every Class member's vehicle is identified in the Mitchell WCTL Reports. Appx716–19. Simply remove the PSA deductions, and the detailed valuation report identifies the ACV.

### 4. To Calculate the PSA, Progressive Ignores and Deletes Market Data That Disproves Its Market Theory

Notwithstanding these markets and standards, Progressive imposes a PSA deduction that averages█%. Appx 1197. Here's how it works: Mitchell hires Blaine Bogus and a three-person team (the "Bogus Team") at J.D. Power to calculate the PSA. Appx1364-1365 (Tr. 17–18). Mitchell provides list price data gathered from Internet advertisements. *Id.* at 21. The Bogus Team compares that data to sales data from its "Power Information Network" ("PIN") of dealers. *Id.* at 21-22. The Bogus Team's data is a black box: J.D. Power refuses to disclose any dealership from which it obtains sales data and has designated it as "Highly Confidential—Outside Counsel's Eyes Only." Nevertheless, Progressive accepts the PSA without question as a basis for reducing its insureds' ACV payments.

The most egregious part of the scheme is that, in calculating the PSA, the Bogus Team excluded from the data all transactions where the sales price exceeds the list price and, until July 2021, excluded every transaction where the vehicle sold for list price. Appx1374-1375 (Tr. 57–60); Appx1187-1190. This bears repeating: The Bogus Team made the spurious assumption that transactions at or above list

8

price are outliers, notwithstanding that it made no inquiry to determine how often those purported "outliers" occur and, in fact, had no idea how many records were being excluded. Appx1374-1376 (Tr. 57–58, 61–63). An honest look at the data shows vehicles selling at list price—not even counting transactions where a vehicle sold for more than list price—comprise ██% of the PIN data transactions. Appx1188. Discarding and deleting data because of an undesirable (to Progressive) but relevant characteristic invalidates the data. *Id.* Correcting for the deliberate exclusion of transactions at list price results in a negligible ██ variance between sold and list prices. *Id.* & Appx1247.

And this does not even account for transactions where the sold price exceeded the list price by a penny or more, which the Bogus Team also discarded, keeping no record of how many of such transactions were excluded. Appx1394 (Tr. 137); Appx1188-1189. As Felix explains, for a vehicle to sell for more than its listed price is not an outlier or an oddity. Appx418-419.

Moreover, the Bogus Team does not account for—and has never even investigated—transactions involving a military/employee/family discount, financing through the dealership, or other reasons a sold price might be less than list price that are unrelated to a vehicle's cash market value. Appx1378-1379 (Tr. 73:22– 75:5). Instead, after tossing transactions selling at list price or a penny more, the Bogus Team credulously accepts that any difference up to a staggering ██ between

list and sold price is the product of negotiation in a cash transaction,[4] despite never

making any effort to determine whether that is true. *Id*. at 74:20–75:5. Consider that

one of the primary reasons a vehicle might sell for less than list price is that a

dealership simply offered less than it otherwise would have on a vehicle trade-in—

or might be incentivized to sell for a below market price because the purchaser has

an attractive trade-in. Appx416-417. Not only are these instances unrelated to actual

market value, they are irrelevant in the context of total-loss insureds, who have no

vehicle to trade in. Also, instances where a dealership might chop a few hundred

dollars off list price because the consumer is financing through the dealership—

meaning it will more than make up the notional "discount"—are irrelevant because

Progressive owes actual *cash* value, not actual financed value. And that some people

may be entitled to a generally unavailable discount is irrelevant to the *actual* cash

value, not discounted cash value.

Unfortunately, Progressive's vendors claimed they no longer have the full

transactional data and thus cannot calculate the actual difference (if any) between

sold and list prices when considering *all* transactions that occurred in the market. So,

Plaintiffs retained a statistician, Jeffrey Martin, to analyze a large set of transparent

data reported by all dealers to state DMV offices. He identified a robust sample size

---

[4] Like Felix and Mlinko, Plaintiffs are using "cash transaction" to encompass transactions where the consumer self-financed entirely as well as transactions where the consumer secured outside financing rather than using the dealership to secure financing.

of 1.4 million-2.4 million matches per year. Appx924-931. The results confirm Felix's and Mlinko's testimony: The median Sold-to-List ("S/L") Ratio for each year is 1 (meaning sold and list price are equal), regardless of whether all transactions are considered or if outlier ranges are applied. *Id*. The mean S/L ratio is 1.0 or a *de minimis* amount less or more than 1.0. *Id*. These findings confirm that list price equates to market value and, thus, that the PSA deduction is invalid. These results are summarized in the figures and tables in Appx1697-1701.

In short, instead of looking at the data honestly, Progressive and its vendors began with a forgone conclusion: "Consumers negotiate down the advertised price of vehicles in cash transactions." They then manufactured "support" and thumbed the scale by ignoring and deleting all market data to the contrary. Once this lone invalid adjustment is removed, each Mitchell Report documents a good faith appraisal of each Class Member's loss vehicle.

## B.    The Appealed Order

On August 11, 2023, the district court granted Plaintiffs' motion for class certification. Appx4–31. Initially, the Memorandum Opinion evinces the district court's thorough review and understanding of the claims, defenses, and each party's evidence brought to bear for class certification. After recounting the parties' respective positions and evidence and denying *Daubert* motions challenging Plaintiffs' experts, the court methodically analyzed the application of each element

of Rule 23(a) and 23(b)(3), construing these rules as they have been applied by this Court. *Id.* In its analysis, the Court carefully—and correctly—applied the Rule 23 elements to the facts of this case, finding that Plaintiffs' claims are suitable for class treatment under Rule 23(b)(3). Ten (of thirteen) courts have reached this conclusion on materially identical claims and records.

## SUMMARY OF ARGUMENT

A district court abuses its discretion only if its decision is one with which "no reasonable person" could agree. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000). Did the district court abuse its discretion by certifying a breach of contract class in a case materially indistinguishable from ones that have been certified by ***ten courts*** (out of thirteen)? *See Freeman v. Progressive Direct Ins. Co.*, No. 1:21-cv-03798-DCC, 2024 U.S. Dist. LEXIS 83402 (D.S.C. May 8, 2024); *Reynolds v. Progressive Direct Ins. Co.*, 346 F.R.D. 120, 2024 U.S. Dist. LEXIS 63031 (N.D. Ala. Apr. 3, 2024); *Schroeder v. Progressive Paloverde Ins. Co.*, No. 1:22-cv-00946-JMS-MKK, 2024 U.S. Dist. LEXIS 14044 (S.D. Ind. Jan. 26, 2024); *Curran v. Progressive Direct Ins. Co.*, 345 F.R.D. 498 (D. Colo. 2023); *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-CV-35, 2024 U.S. Dist. LEXIS 11283 (E.D. Tenn. Jan. 22, 2024) (report & recommendation); *Drummond v. Progressive Specialty Ins. Co.*, No. 21-4479, 2023 U.S. Dist. LEXIS 140205 (E.D. Pa. Aug. 11, 2023); *Brown, et al. v. Progressive Mountain Ins. Co., et al.*, No. 3:21-cv-175-TCB, 2023 U.S.

Dist. LEXIS 136472 (N.D. Ga. Aug. 3, 2023); *Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ. 6243, 2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023); *see also Chadwick v. State Farm Mut. Ins. Co.*, No. 4:21-cv-1161-DPM, 2024 U.S. Dist. LEXIS 47154 (E.D. Ark., filed Mar. 18., 2024) (certifying class challenging State Farm's version of the PSA); *Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-cv-02482, 2023 U.S. Dist. LEXIS 153813 (W.D. Tenn. Aug. 25, 2023) (same). The question answers itself: The answer is emphatically no.

Plaintiffs and Class members sustained total losses to vehicles insured by Progressive. To determine the ACV of the totaled vehicles, Progressive followed a uniform process, which involved documenting the particulars of the totaled vehicle and inputting that information into the WCTL system it licenses from Mitchell International, Inc. Everyone—Plaintiffs and their experts and Progressive and its experts—agrees such adjustments are appropriate.

The sole dispute concerns PSA, a reduction to the list/market prices of comp vehicles that purports to "reflect consumer purchasing behavior (negotiating a different price than the listed price)."[5] Unlike the other adjustments, PSAs are (i) speculative (at best) and (ii) *always* negative. Worse, they are calculated using rigged data. For years, Progressive and its vendor companies claimed the PSAs are justified

---

[5] After the PSAs and other WCTL adjustments are applied, the Mitchell report produces a "base value," which is then averaged with another non-Mitchell valuation source, the NADA Guidebook, in the same report to arrive at a "Dual Source Base Value." *See also* note 3.

by millions of transactions where the list price of a vehicle was matched to its reported sale price. Incredibly, to manufacture meretricious "support" for the PSAs, they simply purged from the database all transactions where a vehicle sold for list price or more. Using *only* its skewed data, and making spurious assumptions about this remaining data, Progressive calculates and applies PSAs to reduce its insureds' ACV payments by, on average, ███ .

Plaintiffs brought this breach of contract action individually and on behalf of a class of similarly situated total loss claimants whose ACV payments were reduced by the invalid PSAs. Each element of the breach of contract claims will be decided based on common evidence. And the evidence, to put it bluntly, shows that the PSA is bunk. Indeed, millions upon millions of state DMV transactional data show vehicles typically sell for list price—under any definition of typical (median, median, and mode).

That is why Progressive and its vendor companies were forced to simply delete and manipulate data to manufacture a fake market to "support" the meretricious PSA—without such manipulation, the typical sold-to-list ratio hovers at approximately 1.0. This is not surprising: As explained above, Plaintiffs' industry experts, Kirk Felix and Paul Mlinko, explained the premise underlying the PSA— that dealers list vehicles above market with the expectation of future negotiation— is outdated and false. In the data-rich, competitive modern auto market, dealers price

14

vehicles to market and do not engage in systematic negotiation-driven price discounting. Of course, as with any other product, some vehicles sell for below market prices—perhaps because of specialized, atypical discounts, ancillary products, the presence of a trade-in, or perhaps because some consumers are simply excellent negotiators who can secure atypical, below-market deals—but this does not change the fact that used autos in the modern market are priced to market. *See supra* pp. 5–10; *see also Signor v. Safeco Ins. Co. of Ill.*, 72 F.4th 1223, 1231 (11th Cir. 2023). This reality provides color for Progressive's decision to cook the books to spawn a basis for the PSA.

Plaintiffs presented evidence through their appraisal expert, Jason Merritt, that other than the PSA, the individualized Mitchell Reports document a sound, reliable calculation of ACV. So, at trial, the predominant question will be whether Progressive's application of the PSA means it was not considering "market value" but was instead paying an artificially deflated value. *See Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F. 4th 976, 980–81 (8th Cir. 2021). If so, the clear remedy— supported by expert appraisers and approved in the numerous cases discussed above—is awarding damages calculated by backing out the invalid PSA from the WCTL reports. Progressive thumbed the scales by applying the PSAs, and the remedy is to remove the thumb from the scales—to excise the only flaw in its ACV valuation.

In this appeal, Progressive claims the district court "abused its discretion"—meaning its decision was one with which no reasonable person could agree—when it sided with the overwhelming consensus of courts that have certified materially identical claims. There was no abuse of discretion here. Simply put, there's a reason so many courts have certified classes challenging the PSA: The requirements of Rule 23(b)(3) are convincingly met. Indeed, here and before the district court, Progressive scarcely even defends the propriety or legitimacy of the PSA, focusing its defense instead on the speculation it could have paid Plaintiffs and Class members *even less* had it chosen some other company as the vendor to calculate ACV. In other words, Progressive's strategy is to change the subject. But this case is about what Progressive did; it is not about any of the many things it did not do. And in any event, Plaintiffs' claim is not that the company Progressive chose as a vendor to calculate ACV constituted a breach of contract—Plaintiffs' claim is that that vendor's *calculation of ACV* constituted a breach of contract. So, it is not responsive for Progressive to suggest it could have picked a different company to use in its determination of ACV. The issue is not the company; the issue is the ACV determination.

Ten courts—the overwhelming majority—concluded that claims and records materially indistinguishable from those below are suitable for class treatment. It is not the case that "no reasonable person" could agree with such conclusions. So, it

was no abuse of discretion to find class treatment is appropriate. This Court should affirm the Order on appeal.

## STANDARD OF REVIEW

Class certification is appropriate where a plaintiff shows by a preponderance of evidence that the Rule 23 elements are met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2009). This Court reviews orders on class certification for abuse of discretion, "which occurs if the [] decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Hydrogen Peroxide*, 552 F.3d at 312. An abuse of discretion occurs only if the decision is "arbitrary, fanciful or clearly unreasonable[,]" meaning "no reasonable person would adopt the district court's view." *Oddi*, 234 F.3d at 146.

## ARGUMENT

### A. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT COMMON ISSUES PREDOMINATE

Two points are critical at the outset. First, Progressive's argument is the district court abused its discretion by failing to engage in a rigorous analysis. Initial Brief (IB) at 24, 28. Even if so, the remedy would be to remand for the district court to engage in such analysis in the first instance, given this Court is a "court of review, not of first view[.]" *O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 763 n.3 (3d Cir. 2021) (quotation omitted).

Second, reversal is appropriate only if "no reasonable person would agree with the decision made by the trial court." *Oddi*, 234 F.3d at 146. As a sister court explained, those who contest findings under an abuse of discretion standard are like "rich men who wish to enter the Kingdom; their prospects compare with those of camels who wish to pass through the eye of a needle." *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir. 1991), *cert. denied*, 502 U.S. 810 (1991) (citing Matthew 19:24). Here, Progressive argues that the abuse of discretion was a failure to engage in a rigorous analysis—and the evidence for such failure is that had the district court done so, "it would have recognized that individualized issues…will overwhelm any arguably common issues in this litigation." IB at 28. In other words, according to Progressive, the district court simply *must* have failed to engage in a rigorous analysis because…it granted class certification. But so did *nine other jurists* in analyzing indistinguishable claims. Agreeing with nine other cogent decisions is not something "no reasonable person" could do—it is no abuse of discretion. Progressive failed to pass through the eye of a needle.

1. **The district court did not abuse its discretion in finding that it is more likely than not that common evidence can be used to establish whether class members have Article III standing and that Progressive breached its contract.**

Progressive's first argument is the district court abused its discretion in finding common issues were more likely than not to predominate over individual

ones as to the issues of liability (i.e., whether Progressive is liable for breach of contract) and Article III standing.[6] IB at 29-35. In so doing, Progressive conflates the two issues. For clarity, Plaintiffs address these distinct issues distinctly.

### a.    Article III

As the Supreme Court explained, Article III and liability must be separately analyzed. *See, e.g., Ariz. St. Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (cautioning against conflating the merits with standing); *Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) ("[W]e separate our standing inquiry from any assessment of the merits of the plaintiff's claim . . . [and] assume for the purposes of our standing inquiry that a plaintiff has stated valid legal claims."). The merits analysis is whether a plaintiff is correct—the Article III analysis is whether a plaintiff is permitted to *attempt to prove* she is correct.

Progressive argues that if it paid ACV, Plaintiffs would therefore lack standing. IB at 31. That's wrong, but it also betrays a fundamental misunderstanding of Article III standing. A court can only adjudicate whether Progressive's determination of ACV was correct if it has jurisdiction to do so. Progressive is essentially asking this Court to adjudicate Progressive's determination of ACV and

---

[6] As previously explained, whether class treatment is appropriate is analyzed under an abuse of discretion standard. The underlying analysis applies the preponderance of the evidence standard. Taken together, the question is whether the district court abused its discretion in finding a plaintiff showed it was more likely than not the Rule 23 elements were met. *See generally Greenwich Collieries v. Dir., Off. of Workers' Comp. Programs*, 990 F.2d 730, 736 (3d Cir. 1993) ("preponderance of the evidence" means "more likely than not").

rule Progressive did not breach its contract, and *for that reason* find it lacks jurisdiction to make such adjudication in the first place. That's nonsensical. Plaintiffs claim they were underpaid and suffered damages directly from the PSA in the amounts of $525.58, $435.25, and $448.07, respectively. Appx1244. If they are wrong, their claims will fail on the merits. But, if so, that would be an adjudication that Plaintiffs are wrong, not that their claims cannot be adjudicated. *See generally Gates v. Towery*, 430 F.3d 429, 432 (7th Cir. 2005) ("By Chicago's lights, unsuccessful lawsuits should be dismissed [for lack of standing] rather than decided on the merits. *That's not the way things work*: A bad theory (whether of liability or of damages) does not undermine federal jurisdiction") (emphasis added). If Plaintiffs are correct, they suffered a monetary injury, which is a concrete, Article III injury. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("[C]ertain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as . . . monetary harms.").[7]

---

[7] Progressive's discussion of nominal damages is both wrong and irrelevant. Those cases stand for the proposition that courts will not order a new *trial* solely on the issue of nominal damages where the plaintiff neither pleaded entitlement to nominals nor requested an award at trial. *See, e.g., Cohen v. Resolution Tr.*, 107 F. App'x 287, 289-90 & n.4 (3d Cir. 2004) (refusing to order new trial where plaintiffs "neither argue that they requested nominal damages nor provide a copy of their complaint to show that they had requested nominal damages"); *Bastian v. Marienville Glass Co.*, 281 Pa. 313, 319 (1924) (refusing to order new trial where "no such request was made" and it whether nominals should be awarded would be "the only matter involved" in a retrial).

It is irrelevant because the district court held "[t]he injury is the devaluation resulting from the application of PSAs," and "if the putative plaintiffs are correct about PSAs, potential class members did not receive the ACV of their vehicles as Progressive was contractually obligated to

20

*Lewis* does not alter this well-established law: The plaintiff lacked Article III standing to challenge a downward condition adjustment that was "more than offset" by a countervailing *upward* condition adjustment in addition to $1,200.00 obtained through *pre-suit* negotiation. *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 460 (3d Cir. 2024). Dispositively, *even if the plaintiff was correct on the merits of his claim*, there was still no injury. This Court's ordered analysis was correct—it analyzed whether the plaintiff sustained an injury irrespective of or even if the plaintiff were to ultimately prevail on the merits. Here, by contrast, Progressive wants the district court to first rule there was no breach, and on that basis decide there is no Article III standing. Also, as the district court noted, and unlike in *Lewis*, any insured who negotiated an additional payment above the Mitchell Report amount from Progressive would not be a class member. Appx25. So, the issue is irrelevant.

Perhaps recognizing this difference, Progressive pivots to suggesting that perhaps there would be no Article III injury if the Mitchell Report amount was more than it would have been had Progressive used "some other state-approved methodology" for determining ACV. IB at 34. This argument is difficult to understand, and because Progressive did not raise it before the district court, it is waived. *E.g.*, Dkt. 56 at 32–34; *Garza v. Citigroup Inc.*, 881 F.3d 277, 284 (3d Cir.

---

pay." Appx25–26. This stands even if the district court was wrong about nominal damages (it was not).

2018) ("[A]rguments not raised before the District Court are waived on appeal."). In any event, the argument still goes to the merits, not Article III standing: Progressive appears to be arguing that *if* it used some "other state-approved methodology" and *if* that amount had been less than the Mitchell amount, then the Mitchell amount must constitute ACV. IB at 34. That's wrong, as discussed below in Sec. (2), but it's also irrelevant—whether Progressive breached the contract by undercalculating ACV is the central *merits* dispute. That a claim may fail on the merits has nothing to do with whether a litigant possesses standing to press it in the first place.[8]

The district court did not abuse its discretion in recognizing well-established law and finding Article III standing was established here and was not likely to be a predominating individualized issue. Appx25–26.

### b. Liability

As for liability, Progressive claims its only relevant contractual obligation is to pay ACV. IB at 30. This is overly simplistic. For one thing, Progressive oftentimes incontrovertibly does not "pay" ACV—even assuming for a second that it properly

---

[8] Moreover, the argument is complete conjecture with absolutely no support in the record. Progressive's argument is that *maybe* there is some other company that *maybe* would offer a lower value and *maybe* is approved by Pennsylvania regulators and *maybe* would comply with its contract—to paraphrase Justice Scalia, it is maybes "built upon" maybes to create a "veritable fairyland" of speculation. *See generally Minnick v. Mississippi*, 498 U.S. 146, 166 (1990) (Scalia, J., dissenting). The district court did not abuse its discretion by grounding its decision in the record, rather than "speculation and surmise." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 299 (1st Cir. 2000) (affirming finding that common issues predominated because "speculation and surmise" cannot "tip the decisional scales" in deciding whether class treatment is appropriate) .

calculates ACV—if only because a policy deductible applies, or the insured retained the salvage vehicle. In any event, Progressive is contractually obligated to base its claim payment on the vehicle's ACV and it is contractually obligated to *determine* ACV based on market value, age, and condition. Dkt. 52 at 3–4. In Pennsylvania, this means determining ACV based on the "highest price" that would be paid in a fair market after a reasonable search for a purchaser. *Dickinson v. Fire Ass'n of Philadelphia*, 378 Pa. 396, 400 (Pa. 1954) (defining market value). By applying the PSAs, Progressive breached both obligations—it underpaid ACV, and it did not determine ACV based on market value, but rather on a truncated, manipulated, artificially low "market" of its own invention. *See Smith*, 18 F.4th at 980–81 (if the PSA is "contrary to industry practices and consumer experiences and therefore not reflective of the vehicle's fair market value, then the insurance company did not consider the [vehicle's] fair market value; it considered an artificially lower value, in breach of its contractual duty") (cleaned up); *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *5 ("Progressive promised to determine ACV by the market value, age, and condition of the vehicle at the time the loss occurs. But if Plaintiff is right, Progressive determines ACV not by market value, but by an artificial, downwardly skewed, and deflated 'market' of its own invention") (cleaned up).

Bluntly, the district court did not abuse its discretion in finding that liability— *i.e.*, whether Progressive breached the Policy—is subject to resolution based on

common evidence, consistent with nine other jurists. The core dispute is whether list prices equate to market value. Dkt. 67, at 7. Progressive says the answer is no, while Plaintiffs say it is yes. Both parties believe the answer is applicable to every class member (indeed, that's why Progressive applied the PSA as to every class member). To support their claims, Plaintiffs present (i) expert testimony from Mlinko and Felix that in the modern used car industry, car dealerships price vehicles to market; (ii) testimony from Merritt that list price is the best starting point in appraising ACV, that the PSAs conflict with sound appraisal standards, but that the Mitchell Reports otherwise document a proper appraisal of ACV; (iii) empirical data from Progressive; (iv) analysis thereof from Lacey, explaining Progressive excluded most of the data and misinterpreted what remained; (v) state DMV data; and (vi) analysis thereof from Martin, showing vehicles typically sell for list price. If an absent class member were to bring an individual claim—like the named plaintiffs in numerous jurisdictions bringing indistinguishable claims based on the same evidence—they could rely on such evidence to make a prima facie case. Indeed, every court to analyze this same evidence concluded summary judgment is inappropriate and a jury should resolve the claim—all of which involved certified classes. *Brown v. Progressive Mountain Ins. Co.*, 2024 WL 399479, at *3 (N.D. Ga. Feb. 1, 2024); *Volino v. Progressive Cas. Ins. Co.*, 2024 U.S. Dist. LEXIS 52783 (S.D. N.Y. Mar. 22, 2024); *Chadwick v. State Farm Mut. Auto. Ins. Co.*, No. 4:21-cv-1161-DPM,

2024 U.S. Dist. LEXIS 47154 (E.D. Ark. Mar. 18, 2024). It was not an abuse of discretion for the district court, upon presentation of the evidence, to conclude it is more likely than not that the answer will be driven more by common evidence than by individualized evidence.

**B.**     **The district court did not abuse its discretion in finding that individualized vehicle valuations—which have already occurred and are not contested—do not predominate over common questions.**

Progressive's next argument is vehicle valuations are inherently individualized, and it was therefore an abuse of discretion for the district court to find common issues are likely to predominate. IB at 35-45. Not so. To be sure, vehicle valuations are individualized. But *Mitchell has done them*, and no one questions their validity. Indeed, setting aside the dispute over the PSA, *every witness*, including Plaintiffs', agrees with Mitchell's methodology and its application of that methodology. Appx1644–1645 (Tr. at 21:6–25:11); Appx963–964 (Tr. at 58:11–62:19). True, if Plaintiffs were contesting the Mitchell Reports in their entirety and alleging things must begin anew, class treatment may be inappropriate. Or perhaps if Plaintiffs were resting their theory of liability on a state regulatory violation without offering any evidence of ACV, class treatment would be inappropriate. But unlike the cases on which Progressive relies, Plaintiffs are doing neither. As such, the individual nature of vehicle valuations does not preclude class treatment—

certainly, it was not an abuse of discretion for the district court, along with nine others, to so find.

Start with *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022) and *Ngethpharat v. State Farm Mut. Auto. Ins. Co.*, No. C20 454 MJP, 2022 WL 1404526 (W.D. Wash. May 4, 2022), which involved allegations that insurance companies breached their policies by violating the same state regulation. In *Lara*, the plaintiffs challenged the way condition adjustments were disclosed, alleging they were "not itemize[ed] or explain[ed]," as required by the state regulation. 25 F. 4th at 1137. But they offered no evidence that violating the disclosure requirements constituted a breach or resulted in an unsound ACV. The same was true in *Ngethpharat*. 2022 WL 1404526, at *3 (noting plaintiffs never "*intended* to show that they received less than the ACV"). The comparisons fall flat: A regulatory violation is not *ipso facto* a breach. Consider a negative condition adjustment of $1,000.00 that was accurate (the vehicle was in poor condition) but not itemized. To establish a valid claim, the insured would have to show not only that the adjustment was not itemized (regulatory violation), but *also* was inaccurate (breach). But because the plaintiffs' cases hinged on a technical regulatory violation, they put on no proof they received less than ACV, nor even attempted to present common evidence—or any evidence at all—of how to appraise a vehicle's cash market value. *See also* Dkt. 67 at 11.

By contrast, Plaintiffs present factual evidence that establishes liability and damages, not a regulatory violation. Even had Progressive itemized every detail of how it calculated the PSA deductions, Plaintiffs' claims would be precisely the same because the PSA is inaccurate, not insufficiently disclosed. As one court put it, "[i]f the PSA is invalid based on the evidence of the used car market, then it is not a proper element of calculating ACV." *Brown*, 2024 WL 399479, at *3. And Plaintiffs put forward common evidence that the remainder of the WCTL valuation constitutes a proper appraisal of ACV determined by market value, which, if credited by a jury, would establish the damages amount. This is precisely the distinction made by numerous courts in addressing *Lara*. It is not that they disagreed with *Lara*—instead, they found it inapposite because, unlike in *Lara*, the plaintiffs challenging PSA deductions *do* allege Progressive paid less than ACV and *did* present common evidence of how to calculate ACV in a manner consistent with the Policy, which constitutes common evidence of underpayment,[9] not merely insufficient itemization, and of a breach of the Policy, not an extracontractual state regulation. *E.g.*, *Volino*,

---

[9] This is why it's irrelevant that, as Progressive points out, IB at 37, *Lara* noted unless the plaintiffs showed underpayment of ACV, they "cannot win on the merits." 25 F. 4th at 1139. That's true— and the problem in *Lara* was the plaintiffs *did not believe they had to prove underpayment and thus presented no evidence as to that issue*. Instead, they thought requiring evidence of underpayment would "force[] them to 'prove two breaches'—the violation of the regulation and then a second breach of actual underpayment." *Id*. But as the Ninth Circuit pointed out, while it may be the case that the plaintiffs could prove a regulatory violation without proving underpayment, they could not prove a *breach of contract* without proving underpayment. And as such, Progressive's attempt to fault the district court for parenthetically observing the plaintiffs in *Lara* did not purport to show they were underpaid ACV falls flat. IB at 38.

2023 U.S. Dist. LEXIS 44666, at *27(distinguishing *Lara* because "the plaintiffs offered no proof of [ACV], and did not even argue that they had been underpaid. Rather, those plaintiffs argued that certain adjustments violated technical state insurance regulations that did not affect the valuation."); *Clippinger*, 2023 U.S. Dist. LEXIS 153813, at *32–*34; *Curran*, 345 F.R.D. at 508–09; *Costello*, 2024 U.S. Dist. LEXIS 11283, at *61–*62; *Freeman*, 2024 U.S. Dist. LEXIS 83402, at *39 n.10. Frankly, it beggars belief that all these courts were abusing their discretion by finding *Lara* is distinguishable.

Progressive also misplaces its reliance on *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414 (5th Cir. 2023). There, the plaintiffs alleged USAA breached its contract by valuing cars using a company that was illegal under a Louisiana regulation because it was not a "recognized used auto industry source." *Id*. at 417. Their theory was that USAA was required to use one of those recognized companies, such as NADA, KBB, Edmunds, etc. If so, the plaintiffs claimed damages could be measured by using NADA values. *Id*. at 419. But the plaintiffs acknowledged this was arbitrary, as NADA was but one of several "recognized used auto industry source[s]" permitted by Louisiana law. So, even if the plaintiff's theory were correct, that would mean any "recognized used auto industry source," not just NADA, could be used *as a matter of law* to establish damages or the lack thereof. *Id*. That is not Plaintiffs' theory.

Indeed, Plaintiffs' theory is not that damages are established as a legal matter (as in *Sampson*), but as a factual matter. In *Sampson*, the plaintiffs conceded other guidebooks, not just NADA, also constituted ACV as a matter of law *under their own theory*—they just posited they were entitled to pick whichever of those options they wanted, which the Fifth Circuit (rightly) rejected. Critically, the plaintiffs put forward no evidence NADA constituted ACV *in fact*, nor could they: As the Fifth Circuit explained, NADA cannot constitute ACV in fact because, among other glaring shortcomings, its values, unlike Mitchell's, "do not account for a vehicle's unique condition . . . which is relevant to its [ACV]." *Id.* Indeed, the *Sampson* plaintiffs, as in *Lara*, rested the entirety of their claims on a regulatory violation and explicitly disclaimed any "require[ment] to demonstrate [] NADA equals cash value *in fact*[.]" *Id.* at 419. As one court pointed out:

> [The *Sampson* plaintiffs] had not demonstrated that NADA equates to ACV in fact, nor put forward a coherent theory on which NADA, but not KBB or Edmunds, etc., can serve as a determinant of injury and liability as a matter of law. Here, in contrast, the Court finds that common issues predominate precisely because of the coherent theory Plaintiff sets out—that Mitchell, but for the PSA deduction, results in ACV, so any estimate with the PSA deduction falls short in that amount.

*Curran*, 345 F.R.D. at 509 n.8 (cleaned up); *see also Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *33–*34. In other words, unlike in *Sampson*, Plaintiffs agree vehicles must be individually valued. That's exactly what the Mitchell valuations are—*individual market valuations*. And Progressive provides no reason why its own

29

market valuations cannot be used as evidence of ACV. *Cf. Volino*, 2023 U.S. Dist. LEXIS 44666, at *9 ("Progressive can hardly complain that the methodology Plaintiffs would impose on them is the one Progressive chose and developed.").

Put bluntly, Progressive is doing nothing more than attempting to change the subject by abandoning any defense of what it actually did, and instead suggesting it would not have been explicitly against the law to use a company other than Mitchell to calculate the ACV of its insureds' totaled vehicles. IB at 40. Plaintiffs do not argue otherwise—indeed, Plaintiffs do not argue it was against the law to select Mitchell as the company through whom to calculate ACV. But whatever company Progressive selected, it was required to comply with its contract—and Plaintiffs presented evidence that Progressive failed to do so by underpaying ACV and by failing to determine ACV based on market value, age, and condition. That Progressive could have breached its contract while using a different company to do so is irrelevant. Said another way, Plaintiffs' claim is not that Mitchell is a legally impermissible company for calculating ACV. Plaintiffs' claim is that the calculation of ACV was not "determined by" market value and, concomitantly, was too low by the amount of the PSAs. If so, it would be no defense for Progressive to point to guidebook values that *are also* less than ACV. *See Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *6 ("Yes, Progressive could have harmed members more had it used some other method of determining ACV. But the possibility of greater harm under the

NADA standard does not imply a reciprocal benefit from using the PSA; relative privation is still privation."). Or, as the district court put it, "it is possible for Progressive to have paid the putative plaintiffs more than they would have if applying an alternative valuation method yet still have failed to pay the ACV of the putative plaintiffs' vehicles." Appx21–22.

Oddly, Progressive pivots to real estate cases that support *Plaintiffs'* position. There, the plaintiffs offered common evidence of how to calculate ACV—the Xactimate method utilized by State Farm, but without the offending element (labor depreciation). *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460–61 (6th Cir. 2020); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 375–76 (8th Cir. 2019); *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 711 (5th Cir. 2020). State Farm's contract required it "to calculate the ACV payment in accordance with the prescribed formula"—"the amount it would cost to repair or replace damaged property, less depreciation." *Stuart*, 910 F.3d at 376. Progressive claims there was a "prescribed formula" for determining ACV in those cases, but not here.[10] In so

---

[10] In *Mitchell*, *Hicks*, and *Stuart*, the insurance policies explicitly, or by incorporation of law, required the insurer to base ACV payments on "replacement cost less depreciation," and the plaintiffs alleged depreciating labor violated such duty. Notably, the "replacement cost less depreciation" requirement in those policies was not self-executing—no different than determining ACV based on "market value, age, and condition," ACV determined by "replacement cost less depreciation" must still be calculated. And State Farm used an estimation vendor (Xactimate) to *calculate* its ACV obligations. Here, Progressive's Policy provides an ACV definition that is, if anything, *more specific* than "replacement cost less depreciation" and Plaintiffs presented common evidence that, by applying PSA deductions based on manipulated data, verifiably false

doing, it ignores its explicit duty to pay ACV determined by "market value, age, and condition," which is at least as specific as the prescribed formulae from *Mitchell*, *Hicks*, and *Stuart*. *See Clippinger*, 2023 U.S. Dist. LEXIS 153813, at n.8 (as in these cases, State Farm was required to value autos "in line with a prescribed formula— that is, by market value, age, and condition at the time of the loss"); *accord Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *15 (same). And as in those cases, Plaintiffs contest a discrete element—the PSA—and makes a prima facie case by offering the Mitchell Report without the PSAs as evidence of ACV determined by "market value, age, and condition," as prescribed by Progressive's Policy. Absent class members could rely on the same evidence in making a prima facie case were they to bring an individual action. So, these cases support Plaintiffs, not Progressive.

Finally, Progressive points to two outlier decisions, *Ambrosio v. Progressive Preferred Ins. Co.*, 2024 U.S. Dist. LEXIS 36963 (D. Ariz. Mar. 4, 2024) and *Kroeger v. Progressive Universal Ins. Co.*, No. 4:22-cv-00104-SHL-HCA, 2023 U.S. Dist. LEXIS 231824 (S.D. Iowa Nov. 20, 2023). In *Ambrosio*, the court started on firm ground: "[T]he crux of the issue here is whether Progressive breached its obligation under the Policy to pay out the ACV of totaled vehicles by applying a PSA." *Id*. at *22. It lost its footing in hypothesizing that "even if Plaintiffs

---

assumptions about the used-car market, and which are contrary to appraisal standards, Progressive failed to determine ACV based on "market value, age, and condition" of the loss vehicles.

*established* the PSA was a policy violation, Progressive would still be entitled to present individualized evidence that it did not breach [the] contract." *Id*. at \*14 (emphasis added). That makes no sense. Evidence either establishes a policy violation (i.e., a breach) or not. And predominance asks whether plaintiffs have shown common evidence can be used to make out a prima facie case of liability. Perhaps that is why the Ninth Circuit quickly granted interlocutory review of this outlier decision. *Ambrosio v. Progressive Preferred Ins. Co.,* No. 24-1633, ECF No. 29 (9th Cir. Apr. 26,2024).

*Kroeger* is equally unpersuasive. Indeed, it is self-distinguishing, as it admits parting ways with the consensus because of "peculiarities of Iowa [and Eighth Circuit] law." *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at \*37; *accord Curran*, 345 F.R.D. at 509 n.9. Also, *Kroeger*'s interpretation of the cases it purported to follow was questionable, putting it mildly. While *Kroeger* thought *LaBrier* and *Stuart* compelled it to deny class certification, the *Reynolds* court found "these same cases persuade the Court all the more that class issues do, in fact, predominate here." 2024 U.S. Dist. LEXIS 63031, at \*38. *Kroeger* got it wrong, while *Reynolds*—and the nine other courts to grant certification, including *Chadwick*, a court within the Eighth Circuit decided after *Kroeger*—got it right. At the very least, it was not an abuse of

discretion for the district court to join the majority consensus in finding class treatment is appropriate.[11]

Progressive summarizes its argument with an ipse dixit assertion that a jury in this case will be called to decide whether Progressive's appraisal of ACV was a "reasonable estimate" of ACV. IB at 45. What? No, they won't. This tort-like standard is nowhere in the Policy. The Policy does not obligate Progressive to do nothing more than make a "reasonable estimate" of ACV. The Policy asserts that Progressive will determine ACV based on market value, age, and condition. In any event, whether the contract should be interpreted—which is a matter of law—to mean that Progressive's only obligation is to make a "reasonable estimate" of ACV is not something that has come before the district court or been briefed by the parties.

One final point: What, exactly, was the abuse of discretion here? In its ten pages, Progressive never even attempts to identify one. It just argues the district court should have found the cases it cites persuasive. But that has nothing to do with whether the district court engaged in a "rigorous analysis" of *Plaintiffs'* claims and the record in *this* case (it did), whether it made an errant conclusion of law

---

[11] Progressive handwaves away these ten cases by asserting all ten jurists failed to engage in a rigorous analysis. IB at 44. Perhaps Progressive is a very unlucky litigant. The scorecard is currently 10-3. It strains credulity that ten jurists came to a conclusion that "no reasonable person would adopt[.]" *See Oddi*, 234 F.3d at 146. Even assuming the three minority rulings were reasonable, it would not follow that the ten rulings were therefore *un*reasonable. Put bluntly, in an 10-3 jurisprudential scorecard, it is arguably the case the three are not unreasonable, just a minority. But in what universe are the *ten* the unreasonable ones?

34

(Progressive identifies none, nor even attempts to) or an improper application of law to fact (again, Progressive identifies none, nor even attempts to). There was no abuse of discretion.

### C. The district court did not abuse its discretion in finding that Progressive's manipulation and exclusion of data contributes to finding that common issues are likely to predominate.

Next, Progressive provides a convoluted argument that (i) market value and ACV under its Policy are indistinguishable and (ii) the district court abused its discretion by focusing solely on the PSA. IB at 45-51. This argument fails for numerous reasons.

*First*, Progressive builds its argument on a quote taken from the district court's *adequacy* analysis. The district court was rejecting Progressive's argument that because some class members would have received even less money had Progressive used some company other than Mitchell to calculate ACV, there was a disqualifying conflict. Appx21–22. Such argument makes no sense, and was properly rejected. Relevant here, however, Progressive now builds an entire argument that the district court abused its discretion in finding common issues are likely to predominate based on a point made in the court's *adequacy* analysis. Obviously, that dog won't hunt.

*Second*, Plaintiffs presented evidence *not only* that application of the PSAs violated the contract, *but also* that ACV is properly calculated by utilizing the Mitchell Reports after the PSAs are excised. *See Curran*, 345 F.R.D. at 508

(common questions predominate "not simply because Plaintiff wants a jury to conclude that the PSA does not represent ACV, but because Plaintiff wants a jury to conclude that omitting the PSA from each valuation produced by Mitchell *would* represent ACV"); *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *40–*41 (certification was appropriate because the plaintiffs "present[ed] common proof that the PSA is invalid under Progressive's policy and should not have been used in the total loss valuations. *On top of this*, they intend to present common evidence of correctly calculated ACV—the Mitchell Report—to prove class members were paid less than required under the policy[.]") (emphasis added). So, it is not the case that Plaintiffs are *only* showing the PSA is illegitimate: They are also showing ACV is *properly* calculated by taking the average list/market price of comp vehicles, adjusted for differences in condition, equipment, and mileage—in other words, the Mitchell Reports, after excising the PSAs, constitutes ACV.

*Third*, Progressive's complaint that the district court focused on the PSAs is odd. After all, that is the Parties' only *dispute*. All witnesses agree with Progressive's valuation except for the PSA. Appx1644–1645 (Tr. 21:6–25:11); Appx963–964 (Tr. 58:11–62:19); Appx714–19. It is unsurprising—and certainly not an abuse of discretion—that the district court focused on the Parties' actual dispute.

*Fourth*, Progressive's suggestion that ACV and market value mean the same thing in its Policy makes no sense. The Policy states ACV will be "determined by"

market value. For something to be "determined by" another requires that they be different things. Otherwise, the Policy would effectively read that ACV will be "determined by" ACV (or market value will be "determined by" market value). The difference between the two terms is not difficult to understand: Market value is general, ACV is specific. So, one must first identify the market value of, say, a generic 2020 Hyundai Sonata in a locale. Then, adjustments based on a *specific* Hyundai Sonata (condition, mileage, etc.) are applied to determine that vehicle's specific ACV. Doing so means that (specific) ACV is "determined by" (general) market value. The only dispute between the parties concerns that first step.

Plaintiffs contend dealers price to market, and so list prices equate to market value—and they have presented evidence in support thereof through Mlinko's and Felix's expert testimony, empirical DMV market data, JD Power's own data, and Merritt's expert testimony. Progressive claims that dealers price above market, and so a PSA must be applied to drive the price down to actual market value, claiming as support the manipulated and truncated data. As the Eighth Circuit explained, if Plaintiffs are correct that the PSA is "contrary to industry practices and consumer experiences," the insurer "did not consider the truck's fair market value; it

considered an artificially lower value, in breach of its contractual duty[.]" *Smith*, 18 F.4th at 980–81.[12]

If Progressive's view of the market is correct, Plaintiffs' claims will fail along with those of all other Class Members—which cuts in favor of, not against, class certification. Either way, it was not an abuse of discretion to find on this record that common issues are more likely than not to predominate, just as nine other courts found. If an abuse of discretion occurs only if "no reasonable person would agree with" that decision, how could nine jurists—across varied jurisdictions, with varied jurisprudential philosophies—come to the same conclusion?

Moreover, contrary to Progressive's implication, the two issues run together—Plaintiffs' evidence (that Progressive manipulated and excluded data it did not like, ignored market realities, ignored vast empirical data, and violated appraisal standards) would permit a reasonable jury to find both that Progressive did not "determine" ACV based on market value and (for pretty much the same reasons) that it underpaid ACV. Dkt. 52 at 4–12. As one court explained, "if the application of the PSA is found to be generally violative of Progressive's form policy, it would necessarily be based on a finding that application of the PSA results in a payment different from the [ACV] of the totaled vehicle." *Brown*, 2023 U.S. Dist. LEXIS

---

[12] Progressive suggests Plaintiffs changed their theory on this point. IB at 49. Wrong again. Plaintiffs made this precise point in their Motion, again in their Reply, and again in responding to the 23(f) petition.

136472, at *4; *see also, e.g.*, *Curran*, 345 F.R.D. at 508 (similar). Indeed, the PSA—unlike the condition adjustment at issue in *Lara*—is *always* a downward adjustment, so the two issues are inextricably linked.[13]

*Fifth*, Progressive argues that vehicle value, whether ACV or market value, "depends on all the same individualized evidence[.]" IB at 48. Right. "Individualized" things such as vehicle condition, mileage amount, various equipment, and so forth. Progressive already identified and accounted for those individualized vehicle attributes, and all witnesses agree its analysis is sound. It was not an abuse of discretion for the district court to conclude that such evidence in the form of the Mitchell Report can be used by Plaintiffs at trial to convince a jury their proposed ACV amounts are correct—and, were they to bring an individual claim, absent class members could do the same.[14]

*Sixth*, Progressive's reliance on *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178 (3d. Cir. 2019), exposes a fundamental flaw in their entire argument. As Progressive explained, the issue in *Ferreras* was a timekeeping system that allegedly defaulted

---

[13]Progressive's suggestion that Plaintiffs "cannot show that Progressive breached its contractual duty to pay ACV" unless they present evidence the sold prices of comp vehicles utilized in their report exceeded the amount Progressive guessed it would be, IB at 46-47, is addressed in Sec. II below. Suffice it to say this argument relates to the merits, and class certification asks whether there is a fatal *dissimilarity*; the merits analysis asks whether there is a fatal *similarity*. *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, n.34 (3d. Cir. 2016) . So, this argument has nothing to do with class treatment. *See, e.g.*, *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010).

[14] Progressive points out that nothing in Pennsylvania law or the Policy explicitly prohibits the PSAs. IB at 48. That's why this case will be resolved by a jury, not as a matter of law.

to work schedule rather than hours worked, thereby depriving those who worked overtime of additional compensation. IB at 50. The flaw is immediately obvious: Many employees don't work overtime. So, while it may be wrong for a timekeeper system to default to work schedule, each individual would still have to show they worked more than their work schedule hours. Progressive attempts to shoehorn this case into that one by arguing that even if Plaintiffs proved the PSAs are illegitimate, they would still need to present additional evidence of the *proper* ACV amount. Plaintiffs do exactly that: the Mitchell Report after excising the PSAs, supported by Jason Merritt's expert testimony, and factual testimony from Progressive's own representative and witnesses. And because absent class members could rely on this exact evidence were they to bring an individual case, it is common, not individualized, evidence.

Moreover, Progressive's attempt to transform Plaintiffs' claims into ones challenging the "legitimacy of Progressive's methodology" for calculating ACV, IB at 50, fails. Plaintiffs *agree* with Progressive's methodology—it is the standard "comp" methodology, as Mr. Merritt explains. Appx716–19. The dispute concerns whether the starting point should be the list price of comparable vehicles—i.e., whether list price equates to market price—as Plaintiffs claims and have provided evidence to support, or whether it should be a guess as to what the reported sale prices of those comparable vehicles might eventually be based on a poor analysis of

manipulated data, as Progressive claims. And the answer to that question is subject to common evidence.

In sum, as numerous courts have found, if a plaintiff proves application of the PSAs constituted a breach, it would necessarily be because she proved application of the PSA resulted in payment of less than ACV. It was not an abuse of discretion for the district court to join with consensus authority and find Plaintiffs proved common issues and common evidence are more likely than not to predominate.

**D. Plaintiffs were not required to prove that their evidence of ACV is the only evidence of ACV.**

Finally, Progressive claims class certification should be reversed because even if Plaintiff's evidence of ACV is "admissible as evidence of ACV, Plaintiffs have presented no evidence whatsoever that this is the *only* legitimate way to estimate ACV." IB at 52. In other words Plaintiffs cannot show class treatment is appropriate unless they show their evidence of ACV is the *only* evidence of ACV. IB at 52–55. So, the argument goes, class treatment is inappropriate unless the claim can be resolved at summary judgment—after all, if Plaintiffs demonstrated their evidence of ACV is the *only* evidence of ACV, they would necessarily be entitled to judgment as a matter of law.

That is not the law. Class claims go to juries all the time (as this one will). To be sure, the question relevant to whether class treatment is appropriate is not whether there is *one way* to resolve the evidence; the question is whether absent class

members could rely on Plaintiffs' evidence to make a prima facie case. Indeed, a fundamental premise of Rule 23 is that it is preferable to treat like people alike *precisely to avoid* a situation where separate juries come to different conclusions upon review of the same facts. Obviously, this assumes a jury *could* look at the same facts and reasonably come to different conclusions—otherwise, the case never would have made it to a jury.

The cases Progressive cites do not suggest otherwise. Again, in *Sampson*, as discussed *supra*, the plaintiff's theory was that the insurance company's breach was not in the amount that it paid, but in the company it selected to come to that amount. 83 F.4th at 420. The Fifth Circuit explained that assuming that were true, if *any* of the vendors the plaintiffs believed would have been acceptable provided a value lower than USAA had, the "insureds 'are unharmed' as a matter of law under plaintiffs' theory." *Id*. That is nothing like the theory of liability here, which is why numerous courts have distinguished it—here, Plaintiffs claim not that Progressive breached the contract by using Mitchell as a vendor, but by underpaying ACV as a factual matter through application of the PSAs. So, it would do Progressive no good to show that they could have legally used a different vendor, because Plaintiffs are not even claiming Mitchell was an unacceptable vendor. Rather, Plaintiffs presented evidence that Progressive breached its contract as a *factual* matter by underpaying ACV and failing to determine ACV based on market value, age, and condition. So,

the question is merely whether absent class members could rely on that evidence were they to bring an individual case—and it was not an abuse of discretion for the district court to find the answer is "yes."

More to the point, Progressive has not identified a single piece of evidence demonstrating that even assuming it breached its contract (just as the Fifth Circuit assumed the *Sampson* defendant breached its contract), it could have complied with its contract while still paying the exact same amount as ACV or even less (just as the *Sampson* defendant could have complied with its contract by using a valid "source" that was equal to or even less than the ACV amount it paid). Nor could it, given that Plaintiffs' claim is not that Progressive breached the contract by using an invalid source, but that it failed to determine ACV based on market value and underpaid ACV as a *factual* matter.

*Lara* is perhaps even more obviously distinguishable on this point. As Progressive points out, the Ninth Circuit held that even if some of the evidence was common, much of it wouldn't be. IB at 53 (citing *Lara*). That was because whether the condition adjustment was properly itemized was based on common evidence, but whether it was accurate in amount (and thus a breach of contract) was not. After all, to know whether an insurance company properly assessed the condition of a vehicle requires, well, assessing the condition of the vehicle. And there was no evidence in *Lara* that the condition adjustments were systemically weighed against the insureds.

Here, there is no dispute over whether Progressive properly assessed the condition of vehicles, and thus no dispute for a jury to resolve on that issue. *See supra.* So, there will be no individualized evidence on that point—certainly, Progressive has pointed to none. And to the extent Progressive it suggesting it *may* have gotten the uncontested parts of its valuations wrong, "arguments woven entirely out of gossamer strands of speculation and surmise" do not preclude class treatment. *Mowbray*, 208 F.3d at 299; *accord Volino*, 2023 U.S. Dist. LEXIS 44666, at *9 ("[N]one of the[se] issues . . . would undermine Plaintiffs' common proof of ACV, even if they were based on more than speculation[.]"); *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *14 (finding the same argument rests "on speculation, which holds no truck with class certification")

Said another way, it may very well have been the case that, in *Lara*, "much of the evidence" would not have been common to the class. But that is irrelevant to whether in this case, which presents a different theory and different record, "much of the evidence" is likely to be common to the class. Again, "[o]ther cases presenting different allegations and different records may lead to different conclusions." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 507 (2023) (Jackson, J., concurring). Based on the record presented to it, the district court's conclusion that common issues were likely to predominate is not one with which "no reasonable person" could agree. To the contrary, it was a conclusion with which nine jurists have agreed.

## B. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THERE WERE COMMON QUESTIONS WITHIN THE MEANING OF RULE 23(A)(2)

Progressive also argues the "legitimacy" of the PSA is not a common question at all—but, perhaps recognizing the potency of the abuse of discretion standard, attempts to argue the error was in failing to properly apply the "rigorous analysis" standard. IB at 55–62. As an initial matter, the district court did not fail to apply a rigorous analysis.

A district court must conduct a "rigorous analysis," including "a thorough examination of the factual and legal allegations" before determining the Rule 23 requirements are met. *In re Hydrogen Peroxide*, 552 F.3d at 318–20. The district court expressly acknowledged—and embraced—its obligation to conduct a such analysis make necessary factual determinations, and resolve factual or legal disputes relevant to class certification. Appx17–18. And clearly it did so, discussing at length the evidence supporting the Rule 23 elements—and conducting full *Daubert* analyses of Plaintiffs' experts—rather than merely accepting allegations. Appx12–16, 18–27. Progressive's complaint, properly understood, is the district court was "satisfied" the Rule 23 elements were met based on the evidence presented and common questions would be answered based on common evidence, not that it failed to apply a "rigorous analysis" and instead relied on allegations. But how a district court weighs evidence is subject to abuse of discretion review—and it was not an

abuse of discretion for the court to weigh the evidence precisely how most other jurists have done so.

Moreover, Progressive's argument is muddled and relies, again, on a strawman rather than Plaintiffs' actual claims. For example, Plaintiffs claims that because the PSAs are based on manipulated, truncated data, Progressive breached its contract by "determining" ACV not based on actual market value, but rather on a false, artificial "market" of its own creation. Yet, Progressive asserts because "the contract does not require a specific methodology for calculating ACV…the 'legitimacy' of PSAs is irrelevant to whether Progressive has violated [its] policy." IB at 57. This is wrong: As previously mentioned, Progressive's Policy explicitly prescribes the "methodology" for determining ACV, namely that it must be determined by market value, age, and condition. *Clippinger*, 2023 U.S. Dist. LEXIS 153813, at n.8; *Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *15. To the extent that by "methodology," Progressive means the company it used, Plaintiffs have no quarrel with using Mitchell as the vendor. The point is that whatever vendor Progressive selects, it must *use* that vendor to properly pay ACV and determine it based on market value, age, and condition. Frankly, framing this as a "methodology" debate is a misnomer. As the Eighth Circuit explained, if Progressive's view of the market is correct, then its application of the PSAs was consistent with its obligation to "determine" ACV based on market value, and there was no breach. *Smith*, 18

F.4th at 980–81. If Plaintiffs' view of the market is correct, then application of the PSAs was inconsistent with such obligation, and there *was* a breach. That is the core question in this litigation, and the district court did not abuse its discretion in finding such question is more likely than not subject to a common answer based on common evidence. Once again, Progressive is trying to change the subject.

Further muddying the water, Progressive asserts the PSAs are "intended to predict the price for which a used car will actually sell" and that an analysis of JD Power's truncated, manipulated data shows that the PSA inaccurately predicts sale prices, but only by an average of about $116.00. IB at 58–59. First, so what? Plaintiffs are not presenting evidence that the comp vehicles utilized in their own Reports sold for more than Progressive "projected" they would. If doing so is necessary to prove a breach, their claims will fail on its merits, along with those of all Class Members.[15] To be sure, "Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win." *Schleicher*, 618 F.3d at 686. Second, the "analysis" Progressive references is laughable. Progressive's expert

---

[15] Indeed, Progressive explicitly argues that, to prevail in showing it breaches its contract, Plaintiffs would need to present evidence that "list prices *always* reflect market values and that dealers *never* negotiate[.]" IB at 59. Well, Plaintiffs disagree for many reasons discussed herein, including that, as the Eleventh Circuit explained, it is almost certainly the case, based on basic economic principles, that sometimes consumers who happen to be savvy, good negotiators can secure a below-market deal. *Signor,* 72 F.4th at 1231. But even if Progressive is correct and articulated the correct standard, that would only mean Plaintiffs will lose, because they are not attempting to present such evidence to prove their *own* claims, let alone class members'. This is no impediment to certification.

took a sample of JD Power's already manipulated, truncated data, and found that, on balance, the PSA was only off by about $116.00. Appx1439, ¶68; Appx1656 (Tr.67–69). *Of course* a subset of the manipulated data is somewhat consistent with the manipulated data. That isn't the question. The question is whether the data should have been manipulated in the first place. (The answer is "no.") At the very least, it was not an abuse of discretion for the district court to conclude that the general accuracy of the PSA based on an analysis of a subset of manipulated data does not indicate individualized issues are likely to predominate.

Progressive also argues that even if the PSA is illegitimate, that would not establish a breach, because whether Progressive underpaid ACV "depends on the facts and circumstances of that class member's individual valuation and vehicle." IB at 61. But the Parties have no quarrel with any aspect of the valuation other than application of the PSA. So, while valuing used autos and calculating ACV may very well be an individual process, it is not an individualized issue *in this litigation* because it has already occurred, and, as such, does not preclude class treatment.

Moreover, this Court is not working from a blank slate. At the very least, it was not an abuse of discretion for the district court to weigh the evidence and find that whether application of the PSAs constituted a breach of Progressive's duty to "determine" ACV based on market value is subject to a common answer. Progressive never presented any evidence that aspects of the Mitchell valuation

report other than the PSA is flawed and thus Mitchell Reports need to be re-evaluated in their entirety. Instead, all the evidence—Plaintiffs' and Progressive's—is that the Mitchell Report's (individual) assessment of vehicle value *other than the PSA* is sound. So, the only question is whether the PSA itself is sound, which turns on common evidence concerning the used auto market. Do list prices equate to market value (as Plaintiffs contend) or are they above market value (as Progressive contends)? It was not an abuse of discretion for the district court to, after weighing the evidence, agree with ten out of thirteen in finding that the answer to that question will be predominantly based on common evidence.

### C. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING PLAINTIFFS ARE ADEQUATE AND THERE ARE NO DISQUALIFYING INTRACLASS CONFLICTS

The district court correctly held Plaintiffs are adequate and there are no disqualifying intraclass conflicts. To defeat adequacy, an intra-class conflict must be both "fundamental" and actual. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184–85 (3d Cir. 2012). "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Dewey*, 681 F.3d at 184 (quoting *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). Conversely, a conflict that is "unduly speculative . . . is generally not fundamental." *Id.*

Progressive identified *no* conflict, much less a fundamental one. The suggestion that some members "benefitted" from application of the PSAs, and thus would be harmed if Plaintiffs prevail on their claim, is flat wrong. Initially, the court noted this defense is speculative, as Progressive had not shown "*any* potential class members [] benefited from Progressive's application of PSAs." *See* ECF No. 105, at 18. Furthermore, that Progressive claims it could have paid some class members even less under a valuation source it did not (and, under Pennsylvania law, could not) use is irrelevant since it does not "negate [Plaintiffs'] challenge." *Id.* at 18–19. Three other courts rejected this "specious" argument. *See Reynolds*, 2024 U.S. Dist. LEXIS 63031, at *25–*26 ("Yes, Progressive could have harmed members more had it used some other method of determining ACV. But the possibility of greater harm…does not imply a reciprocal benefit from using the PSA; relative privation is still privation.").[16]

Moreover, the district court was within its discretion, based on the *evidence*, in granting certification over Progressive's counsel's unsubstantiated claims Progressive *could have* paid Plaintiffs or class members less under the NADA guidebook standard. All parties—including Plaintiffs and their experts,[17] NADA

---

[16] *See also Brown*, 2023 U.S. Dist. LEXIS 136472, at *12–*13; *Schroeder*, 2024 U.S. Dist. LEXIS 14044, at *28.

[17] Progressive suggests Plaintiffs' appraisal expert "'would accept' the 'NADA retail value' as an appropriate measure of ACV." Brief, at 63. This is patently untrue. Merritt has consistently maintained that NADA alone is incapable of generating a valid ACV appraisal. Among other shortcomings, NADA does not consider the condition of any specific vehicle, and Merritt

representatives, the Fifth Circuit, and even Progressive—agree NADA guidebook values do not and cannot (by itself) constitute a valid ACV based on "market value, age, and condition" of a specific vehicle.[18] If Progressive had based its ACV payments on NADA guidebook values, it would have simply committed a different breach. Progressive's false speculation that some class members may have "benefitted" from application of the PSA fails to establish a fundamental conflict. *See Dewey*, 681 F.3d at 186 (finding "unduly speculative" purported conflict did not defeat adequacy).

## CONCLUSION

For the foregoing reasons, the Order on appeal should be affirmed.

/s/Jake Phillips
Jacob L. Phillips
JACOBSON PHILLIPS PLLC
478 E. Altamonte Drive
Suite 108-570
Altamonte Springs, FL 32701
407-720-4057
jacob@jacobsonphillips.com

---

unequivocally testified vehicle condition is relevant to a valid ACV determination. *See Sampson*, 83 F.4th at 419; Appx714–716, 744. In the deposition transcript Progressive cites, Merritt merely testifies that he "would accept" the Mitchell report includes a genuine NADA value—not that he "would accept" that value as an appropriate ACV determination. Appx 856–59.

[18] *E.g.*, *Sampson*, 83 F.4th at 419. Progressive agrees—it asserted to other courts that it could not use NADA values to calculate ACV. *Ambrosio*, Dkt. No. 18.1, at 26 (9th Cir. Apr. 4, 2024) ("*No one contends* that NADA [] values can be used as ACV without making further adjustments for factors such as vehicle age and condition." (emphasis added)). And, finally, Pennsylvania law forbids the use of NADA values alone for, at least, two reasons: (1) the appraisal must "calculate the average of two figures," and (2) the appraised value "shall be adjusted for equipment and mileage." *See* 31 Pa. Code § 62.3 (e)(1)(i).

Hank Bates
Lee Lowther
CARNEY BATES & PULLIAM,
PLLC
One Allied Drive,  Suite 1400
Little Rock, Arkansas 72202
(501) 312-8500
hbates@cbplaw.com
llowther@cbplaw.com

# CERTIFICATE OF COMPLIANCE

1.    I hereby certify that I, Jacob L. Phillips, counsel for the Plaintiffs-Appellees, am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.    This brief complies with the type-volume requirements of the Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,994 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3.    The brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of the Federal Rule of Appellate Procedure 32(a)(6) and 3d Cir. L.A.R. 32.1(c) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Business in Times New Roman 14-point font.

4.    Pursuant to local rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text of the paper copies, and that it has been scanned for viruses using Malwarebytes version 5.1.5.116, and no virus was detected.

Date: June 28, 2024

*/s/Jake Phillips*

Jacob L. Phillips

*Counsel for the Appellee*

# CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I electronically filed the forgoing Answer Brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.

I further certify that I have served the forgoing document to the following counsel via email, and UPS, postage pre-paid, for delivery within 3 calendar days:

Paul Alessio Mezzina
Amy R. Upshaw
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006

Julia C. Barrett
KING & SPALDING LLP
500 West 2nd Street, Ste. 1800
Austin, TX 78701
Nicole Bronnimann
KING & SPALDING LLP
1100 Louisiana Street, Ste. 4100
Houston, TX 77002

Jeffery S. Chashdan
Zachary A. McEntyre
James Matthew Brigman
Allison Hill White
Erin Munger
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
(404) 572-4600
jcashdan@kslaw.com

*Counsel for the Appellants*

*/s/Jake Phillips*

Jacob L. Phillips

*Counsel for the Appellee*